UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CALIFORNIA FIRST NATIONAL BANK | CIVIL ACTION |
| VERSUS | No.: 16-2699 |
| BOH BROS. CONSTRUCTION CO., L.L.C. | SECTION: "J"(5) |

## ORDER AND REASONS

Before the Court is a *Motion for Summary Judgment* **(Rec. Doc. 36)** filed by California First National Bank ("CalFirst"). Boh Bros. Construction Co. ("Boh Bros." or "Boh") filed an opposition to the motion (Rec. Doc. 43), to which CalFirst replied. (Rec. Doc. 47). Considering the motion, the memoranda, the record, and the law, the Court finds the motion should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

This litigation arises out of two unpaid invoices for labor and materials Boh Bros. provided as part of an expansion project at Noranda Alumina, LLC's ("Noranda") plant in Gramercy, Louisiana ("the Project"). Noranda filed for bankruptcy and never satisfied the invoices. Boh Bros. claims that CalFirst, as Noranda's lender, became the owner of the Project and that Boh Bros. and CalFirst entered into a contract that made CalFirst liable to pay the unpaid invoices.

Boh Bros. executed a contract (the "Construction Contract") with Noranda on September 17, 2015, in which Boh Bros. agreed to provide labor, equipment, and

1

materials necessary for fabrication and installation of a part of the Project.[1] Boh Bros. procured a significant amount of the materials for the Project before execution of the Construction Contract.[2] Accordingly, Boh Bros. promptly issued two invoices to Noranda for its costs: Pay Application No.1 accounted for costs through September 1, 2015 amounting to $1,063,200; Pay Application No. 2 covered costs through September 15, 2015 amounting to $1,329,000.[3] These invoices were dated September 17, 2015.[4]

CalFirst provided the financing for the project pursuant to Lease Agreement Order No.ML-00269, Lease Schedule No. 1 ("Lease Agreement," "Lease Schedule," respectively), and various subsidiary agreements entered into between CalFirst and Noranda.[5] The financial backing for the Project was structured in the form of a lease—what the parties both refer to as a form of "disguised financing."[6] Per the Lease Agreement, CalFirst, as "lessor," agreed to "lease to Lessee [Noranda] the hardware, software, equipment" and the associated production costs.[7] In a letter agreement, CalFirst agreed it would "advance[e] funds to supplier(s) on behalf of Lessee [Noranda]."[8] According to the Lease Agreement, "Lessor [CalFirst] at all times

---

[1] (Rec. Doc. 36-1 at 3).

[2] (Rec. Doc. 43 at 5).

[3] (Rec. Doc. 36-4). These amounts describe the cost of the materials and/or services, not the amount actually due.

[4] (Rec. Doc. 36-1 at 3).

[5] (Rec. Doc. 36-1 at 3).

[6] (Rec. Doc. 43 at 6-7). Confusingly, although Boh Bros. uses the term "Disguised Financing" to refer to the financing arrangement, the substance of Boh's argument seems to be that the financing arrangement was in fact a true lease. (*See* Rec. Doc. 43 at 6) ("CalFirst acquired ownership of the Project. As per the structure of this "Lessor/Lessee" financing, CalFirst then would lease the Project to Noranda with Noranda repaying its debt to CalFirst for the construction costs paid directly by CalFirst."). The Court addresses this confusion *infra*.

[7] (Rec. Doc. 36-3 at 2).

[8] (Rec. Doc. 36-3).

retains ownership, title and/or control over Lessee's [Noranda's] right to use the Property in accordance with the terms of the Lease."[9] However, the Lease Agreement specifically states that CalFirst "will not disburse payment to Suppliers . . . [u]nless and until Lessee provides . . . written authorization."[10] As additional security, the Lease Schedule required Noranda to arrange for a letter of credit from a bank acceptable to CalFirst that was equal to 90% of the total disbursements to suppliers.[11]

Noranda advised Boh Bros. of the financing structure shortly after the Construction Agreement was executed.[12] In an e-mail exchange between John Sanchez at Noranda and Kyle Alexander at Boh Bros., Sanchez instructed that invoices should be marked as "Sold to: California First National Bank" and "Ship to: Noranda Alumina, LLC."[13] Karen Brown, a lease administrator for CalFirst and Boh's point of contact at the bank, confirmed this instruction with Mary Hebert at Boh Bros via e-mail, noting that Boh Bros. should forward invoices directly to Noranda for their review.[14] Boh Bros. sent Pay Apps Nos. 1 and 2 to Noranda on September 25, 2015.[15] Despite the labeling instructions, Boh Bros. did not use the "Sold to" indication on the invoices.[16] Instead, because of a limitation in Boh's accounting software, Boh Bros. identified CalFirst as "Customer" on the forms with

[9] (Rec. Doc. 36-3 at 8).
[10] (Rec. Doc. 36-3 at 2).
[11] (Rec. Doc. 43-6 at 16).
[12] (Rec. Doc. 43 at 10).
[13] (Rec. Doc. 36-10 at 3).
[14] (Rec. Doc. 43-12 at 1).
[15] (Rec. Doc. 36-1 at 4).
[16] (Rec. Doc. 43 at 12).

CalFirst's approval.[17] After Noranda approved the invoices, CalFirst paid them in the aggregate amount of $1,196,100.00 on October 15, 2015.[18]

On October 6, 2015—before CalFirst paid Pay Apps. Nos. 1 and 2—CalFirst filed a claim for a declaratory judgment against Noranda in the Superior Court of California, Orange County. CalFirst sought a judgment stating it did not need to make further payments to suppliers.[19] The suit was voluntarily dismissed after CalFirst and Noranda agreed that that CalFirst would advance payments to suppliers of up to $5,000,000.00, including disbursements already made.[20] For disbursements beyond this $5 million mark, Noranda was required to obtain a new letter of credit securing 90% of the requested amount plus the total prior disbursements by CalFirst.[21]

While the first two invoices were pending payment, on October 12, 2015, Boh Bros. mobilized to the site to begin construction on the project.[22] For its subsequent work on the Project Boh Bros. submitted Pay App. No. 3, dated November 6, 2015, for $384,473.25 and Pay App. No. 4, dated December 9, 2015, for $134,703.00 to CalFirst, with CalFirst designated as "customer."[23] According to the terms of the Construction Contract, payment was due 60 days from the date of the invoice.[24] Although Noranda obtained an increased letter of credit from Bank of America, Noranda, "with the

---

[17] (Rec. Doc. 43 at 12).
[18] (Rec. Doc. 36-1 at 4).
[19] (Rec. Doc. 43-16).
[20] (Rec. Doc. 43 at 13).
[21] (Rec. Doc. 43 at 14).
[22] (Rec. Doc. 43 at 4).
[23] (Rec. Doc. 43 at 16-17).
[24] (Rec. Doc. 36-2 at 2).

consent of CalFirst, hand-picked the suppliers it wanted paid."[25] Boh Bros. was not among the suppliers Noranda chose to pay. Noranda never approved the third and fourth invoices, and CalFirst never paid them.[26]

Noranda filed a petition for relief in the U.S. Bankruptcy Court for the Eastern District of Missouri on Feb. 8, 2016. CalFirst then filed an adversary proceeding on March 23, 2016, seeking a declaratory judgement to determine the claims against Noranda and Boh. On March 31, 2016, Boh filed a lawsuit against CalFirst asserting claims for breach of contract and detrimental reliance in this Court. This suit was transferred to the bankruptcy court as an adversary proceeding. The bankruptcy court approved a global settlement (including the settlement of Boh's claims against Noranda for unpaid invoices, and CalFirst's claims against Noranda for breach of the Financing with CalFirst) and the bankruptcy was dismissed. On Nov. 23, 2016, the bankruptcy court dismissed one of the adversary proceedings and transferred the declaratory judgment proceeding to this Court. On April 28, 2017, Boh. Bros. filed its answer and counterclaims.[27] This Court dismissed Boh's negligent misrepresentation counterclaim pursuant to 12(b)(6) but allowed the breach of contract and detrimental reliance claims to go forward.[28] CalFirst then filed the instant motion for summary judgment.

---

[25] (Rec. Docs. 43 at 16).
[26] (Rec. Doc. 36-1 at 5).
[27] (Rec. Doc. 20).
[28] (Rec. Doc. 28).

## PARTIES' ARGUMENTS

Boh Bros. advances two avenues of relief. First, Boh Bros. argues that CalFirst is liable for breach of contract. This claim requires the Court to accept several layered propositions. First, that CalFirst is the owner of the Project by virtue of Noranda and CalFirst's financing agreement. Second, that a "Supply Contract" was formed by the communications between Hebert and Brown; specifically, their e-mails regarding CalFirst's instruction that the invoices be marked as "Sold to [CalFirst]." Third, that CalFirst breached its implicit agreement by not paying the third and fourth invoices.

CalFirst argues that summary judgment is appropriate because each proposition fails. First, CalFirst disputes that the financing arrangement was a "true lease."[29] Rather, the arrangement was "disguised financing," whereby the agreement—although couched in the terms of a lease—was actually a loan secured by a security interest in the Project. This is proved by the fact that Noranda would own the property in exchange for a nominal purchase price of $1 upon completing the required payment schedule.

Second, CalFirst opines that there has never been a contract between CalFirst and Boh Bros. Boh's position is that the Lease Agreement required a "Supply Contract." To satisfy this requirement, Brown entered CalFirst into a "Supply Contract" with Boh Bros. This contractual relationship was formed, says Boh Bros., when Hebert asked Brown whether CalFirst or Noranda was paying the invoices. When Brown responded that Boh Bros. should use a "Sold to California First National

---

[29] (Rec. Doc. 47 at 2).

6

Bank" designation but send the invoices to Noranda first for approval, the "Supply Contract" was formed, and CalFirst became liable to Boh Bros. for the Project invoices, Boh Bros. argues.[30] CalFirst, attacks this argument on multiple fronts, arguing that there was no intent on either side that a contract be formed, and that even assuming there was, Brown lacked actual or apparent authority to enter CalFirst into the alleged "Supply Contract."

Third, CalFirst argues that even assuming all its other arguments fail, summary judgment is warranted because CalFirst met the terms of the alleged "Supply Contract."[31] Hebert, Boh's representative said to have entered into the "Supply Contract" on Boh's behalf, testified the terms were that "CalFirst was going to be paying the invoices on behalf of Noranda . . . after Noranda approved them."[32] CalFirst, argues it paid for the first two invoices, which were approved by Noranda, but did not pay Pay Apps. Nos. 3 and 4 because they lacked the required approval from Noranda. Citing the testimony of Brown, Boh Bros. argues that CalFirst did not send acceptance certificates to Noranda—a step required to set the approval process in motion.[33] CalFirst counters by quoting Brown, who states the actual procedure was for Noranda to let CalFirst know which invoices it wanted to approve, and *then* CalFirst would fill out and return an acceptance certificate.[34]

---

[30] (Rec. Doc. 43 at 8).
[31] (Rec. Doc. 36-1 at 10).
[32] (Rec. Doc. 36-8 at 20).
[33] (Rec. Doc. 43 at 22).
[34] (Rec. Doc. 47 at 6).

Boh's second cause of action is for detrimental reliance. Boh claims it would not have mobilized to the site and continued construction if it were not for CalFirst's representations that it would pay the invoices.[35]    CalFirst argues that any representation it made could not have resulted in Boh changing its position, because Boh Bros. was bound by its contract to continue working on the job until Noranda was in default.

## STANDARD OF LAW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

---

[35] (Rec. Doc. 43 at 27).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325, *Little*, 37 F.3d at 1075. In a non-jury case such as this one, the Court "at the summary judgment stage . . . has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result." *Lyles v. Medtronic Sofamor Danek, USA, Inc.*, 871 F.3d 305, 311 (5th Cir. 2017) (quoting *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991)).

## DISCUSSION

### I. THE BREACH OF CONTRACT CLAIM

Boh Bros. argues CalFirst agreed to pay all of Boh's approved invoices when they entered into a "Supply Contract." According to Boh Bros., the contract was formed by the string of e-mails between Hebert and Brown concerning CalFirst's instruction that the invoices be marked as "Sold to California First National Bank." CalFirst allegedly breached this agreement by not paying Boh's third and fourth invoices. CalFirst rejects that any such contract between it and Boh Bros. ever existed.

To understand Boh's argument that a separate contract existed between Boh Bros. and CalFirst, the Court must first explain the structure of the financing used to fund the construction of the Project. Put in the simplest terms, the parties disagree whether the financing arrangement between CalFirst and Noranda was "a typical finance lease" or "typical financing, disguised as a lease." *See In re Triplex Marine Maint., Inc.*, 258 B.R. 659, 673 (Bankr. E.D. Tex. 2000). This is a very common dispute in chapter 11 bankruptcy cases. Typically, the situation is that a debtor is arguing that a lease constitutes "disguised financing," while the creditor argues that the transaction was a "true lease." *See* E. Carolyn Hochstadter Dicker & John P. Campo, *FF & E and the True Lease Question: Article 2a and Accompanying Amendments to UCC Section 1-201(37)*, 7 AM. BANKR. INST. L. REV. 517, 517 (1999) (hereinafter Dicker and Campo) ("A finding that the lease is a disguised financing would favor the debtor in that the equipment would be considered property of the debtor's estate.").

However, this is not the typical circumstance. A bankruptcy court has already approved a global settlement—including settlement of Boh's vendor claims against Noranda for unpaid invoices as well as CalFirst's claims against Noranda for breaching its financing arrangement—and dismissed the chapter 11 proceeding.[36] In the bankruptcy proceeding, CalFirst had objected to the sale of the property subject to its financing arrangement on the ground that CalFirst enjoyed a security interest in Noranda's property.[37] CalFirst states it agreed to remove the lien in exchange for an upfront payment of $375,000.[38] This allowed the sale of the property go forward. Now that the bankruptcy proceeding has concluded, Boh Bros. claims its rival-creditor, CalFirst, was no mere secured creditor, but a true lessor. In Boh's words, "CalFirst acquired ownership of the project."[39]

In support of its argument that CalFirst owned the Project and was leasing it to Noranda, Boh Bros. cites extensively to language in the Lease Agreement. To be sure, the Lease Agreement purports that CalFirst was the owner of the Project, and that the Lease Agreement constituted a true lease.[40] However, per the UCC, the contractual language is not controlling. Cal. Com. Code § 1203 ("Whether a transaction in the form of a lease creates a lease *or* security interest is determined by the facts of each case.") (emphasis added). The disjunctive "or" signals that an ostensible lease may be a true lease or it may be a security interest (i.e. "disguised

---

[36] *See In re Noranda Aluminum, Inc., et al.*, No. 16-10083 (Bankr. E.D. MO. Nov. 9, 2016).
[37] (Rec. Doc. 47-4).
[38] (Rec. Doc. 47 at 5).
[39] (Rec. Doc. 43 at 6).
[40] The Lease Schedule states, "Lessor at all times retains ownership, title and/or control over lessee's right to use the Property in accordance with the terms of the lease." (Rec. Doc. 36-3 at 8).

11

financing); it may not be both. Helpfully, the UCC provides a two-part analysis for determining whether a lease agreement creates a security interest.

> A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>
> (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;
>
> (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>
> (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
>
> (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

Cal. Com. Code § 1203. Thus, if the lessee is precluded from terminating an agreement prior to the conclusion of scheduled payments—a so-called hell or high-water clause"—and one of the four prescribed conditions is met, then the purported lease is actually a security interest. *See Triplex*, 258 B.R. at 677.

The Lease Agreement states that "LESSEE HEREBY WAIVES THE . . . RIGHT TO CANCEL OR TERMINATE THIS LEASE PRIOR TO EXPIRATION OF THE APPLICABLE TERM."[41] The Lease Schedule states that upon making the final rental payment, "ONE FINAL PAYMENT OF ONE U.S. DOLLAR ($1.00) SHALL BECOME DUE, OWING AND PAYABLE BY LESSEE TO LESSOR, FOR WHICH

---

[41] (Rec. Doc. 36-3 at 2).

LESSOR WILL PASS ITS TITLE IN THE PROPERTY TO THE LESSEE."[42] Thus, Noranda, as debtor, was locked in for the full term of the agreement and—as described in subsection (4)—would become owner of the project for nominal consideration upon compliance with the Lease Agreement. Accordingly, both the conditions sufficient for a security interest are met, and despite the literal language of their financing arrangement, CalFirst was Noranda's secured creditor, not its lessor.

Boh. Bros. attempts to paint CalFirst as the actual owner of the Project, and not a mere secured creditor because Boh Bros., as an unsecured creditor, could not adequately collect on the invoices from Noranda in the bankruptcy proceeding. Boh Bros. argues that as the true owner of the Project, CalFirst agreed to become liable to Boh Boh's invoices as a matter of contract.

Boh's argument is complex. Boh Bros. argues that the Lease Agreement constituted a financing lease between Boh Bros. and CalFirst—a proposition the Court found to be false *supra*—and that for ownership of the Project to rest with CalFirst, CalFirst was required to enter into a "Supply Contract" with a "Supplier," which was Boh Bros. The language in the Lease Agreement allegedly giving rise to this "Supply Contract" requirement is the following: "Lessee acknowledges that it has received and approved any written 'Supply Contract' covering the Property purchased from each Supplier . . . ."[43] The Court disagrees that this language created a

---

[42] (Rec. Doc. 36-3 at 8).
[43] (Rec. Doc. 36-3 at 2).

requirement for CalFirst to enter into a contract with a supplier. Rather, the clause prescribes conditions in the case that one or more "Supply Contracts" exists.[44]

Boh Bros. characterizes the quoted language as giving rise to a requirement, because a contractual requirement is necessary to explain how the e-mail exchange between Hebert and Brown could possibly be demonstrative of an intent on the part of CalFirst to obligate itself to pay all of Boh's invoices.[45] Prior to Hebert and Brown's e-mail conversation, Sanchez at Noranda instructed Alexander at Boh Bros., that Boh's invoices for the Project should be marked as "Sold to: California First National Bank" and "Ship to: Noranda Alumina, LLC."[46] Sanchez noted in his e-mail, "Cal First will ask us for approval once they receive."[47] This labeling instruction caused some confusion at Boh Bros. Hebert wanted confirmation that this was proper. She sent the following e-mail to CalFirst on September 22, 2015:

Hello Ms. Brown.

I was instructed by John Sanchez to contact you on the following project.

[44] In any case, the effect of the Lease Agreement was to create a security interest in the Project; it did not vest ownership with CalFirst.

[45] Louisiana law requires capacity, consent, a certain object, and a lawful cause for the formation of a contract. *La Bo J. P'ship v. La. Lottery Corp.*, 6 So. 3d 191, 194 (La. App. 1 Cir. 2009). Consent is often described as "a meeting of the minds" between the parties, met through an offer and an acceptance. *Id.* Generally, a contract may be perfected through offer and acceptance orally, in writing, or "by action or inaction that under the circumstances is clearly indicative of consent." *Jarreau v. Quackenbush*, 687 F. Supp. 2d 606, 611 (M.D. La. Feb. 2, 2010) (quoting La. Civ. Code art. 1927), *Wilson v. Two SD, LLC*, 186 So. 3d 103, 109 (La. App. 1 Cir. 2015). Further, "[w]hen consent is not express, or when the law creates no presumption of consent, the trial judge is to ascertain, from the facts and circumstances, whether the parties' consent is to be implied from them." *Knect v. Bd. of Trs. for State Colls. & Univs. & N.W. State Univ.*, 591 So. 2d 690, 694 (La. 1991).

[46] (Rec. Doc. 36-10 at 3). The reason that CalFirst requested this "sold to" language is that it is important to a "true lease" transaction. (*See* Rec. Doc. 36-1 at 2 n.1). As discussed *supra*, lessor status is a boon in a bankruptcy proceeding. It does not matter that CalFirst might have intended to be a lessor, though, the Lease Agreement established a security interest in fact. The crux of Boh's grievance appears to be that CalFirst held themselves out as the true lessor, regardless of whether CalFirst actually was one. This argument is best addressed in the Court's analysis of Boh's detrimental reliance cause of action.

[47] (Rec. Doc. 43-12 at 3).

We are requesting some clarifying [sic] on who is the responsible party for payment on our invoices (attached) billed to Noranda Alumina LLC for the Gramercy, LA Bauxite Dock Modifications project. ( as per the Signed agreement attached)

Once I submitted the attached invoices to Accounts Payable @ Noranda (as instructed on the signed agreement)

I was informed that the invoices needed to be address [sic] to California First National Bank as the "Owner/Customer"

Because all of our contracts are a legal agreement between Owner and Contractor, we cannot remove Noranda name off of the invoice, **but we could modify the billing address as:**

Noranda Alumina LLC
c/o California First National Bank
28 Executive Park
Irvine, CA 92614
Attention: Karen Brown

Please let us know if the above information is correct and acceptable? Your advice on this matter is greatly appreciated.[48]

Brown responded four hours later as follows:

Mary,

Can you please email copies of Exhibits A-E that are referenced on the attached contract to my attention. Please also note the invoices need to reflect a sold to California First National Bank, at our address with the ship to Noranda Alumina, LLC with their address. Please forward the invoices directly to Noranda for review.[49]

According to Boh Bros., Brown's insistence that the "Sold to" language be included in

the invoice constituted an "explicit direction from both Noranda and CalFirst that

CalFirst will be responsible to pay Boh's invoices and that CalFirst would be the

---

[48] (Rec. Doc. 43-12 at 1-2).
[49] (Rec. Doc. 43-12 at 1).

customer (instead of Noranda)."[50] The Court disagrees that these two e-mails formed

any contract—explicit or implicit—between Boh Bros. and CalFirst. From Hebert's e-

mail, it is clear that Boh Bros. understood Noranda to be its customer, not CalFirst.

CalFirst insisted it be identified on invoices as the entity that was being "sold to," but

this attempt to gain leverage in a possible bankruptcy by positioning itself a lessor is

not equivalent to an intent to be obligated to pay for any invoice that Noranda

approved. CalFirst had a security interest thanks to its disguised financing

arrangement, it would be bizarre under the circumstances for CalFirst to intend to

obligate itself through the quoted e-mail to obligate itself to paying its debtor's

invoices. The Court views this exchange as a request for proper billing information,

not the formation of a separate contract through an offer and acceptance. *See* La. Civ.

Code art. 1927.

This brings us to the terms of this purported contract—which are notably

absent from the e-mails. Boh Bros. argues that the "Supply Contract" was a promise

to pay all invoices *approved by Noranda.*[51] There is no doubt that Noranda approved

Pay Apps. Nos. 1 and 2 and that CalFirst paid them. It is also undisputed that

Noranda did not approve Pay Apps. Nos. 3 and 4, the invoices that Boh Bros. insists

that CalFirst is liable to pay. Assuming a contract existed with the terms Boh Bros.

has delineated, how could CalFirst be in breach of it? Boh Bros. argues that although

it is true Noranda never approved the invoices, CalFirst never bothered to seek

---

[50] (Rec. Doc. 43 at 11).
[51] Boh Bros. argues the contract was formed by the e-mail communications between Hebert and Brown. Hebert, testified the terms of the agreement were that "CalFirst was going to be paying the invoices on behalf of Noranda . . . after Noranda approved them."[51]

authorization from Noranda.[52] Specifically, Boh Bros. points to testimony from Brown in which she admits she never sent acceptance certificates to Noranda for Pay Apps. Nos. 3 and 4. According to Boh, this is evidence that CalFirst attempted to shirk its obligation to pay Boh's invoices by never giving Noranda notice that CalFirst had received any invoices.

Boh Bros. has taken Brown's testimony out of its proper context. According to Brown, the proper chain of events is that Noranda would send an invoice to CalFirst, with a request that the invoice be paid along with a request an acceptance certificate.[53] Given, that Brown's testimony is the only basis Boh provides for its assertion that CalFirst attempted to prevent Noranda from approving the invoices, there is no evidence that CalFirst ever violated the alleged contract. Thus, even assuming that CalFirst implicitly agreed in an e-mail to pay any invoice from Boh Bros. its debtor approved, CalFirst never broke its promise. Because the Court has determined that no contract ever existed between Boh Bros. as a matter of law,[54] summary judgment shall be granted on Boh's breach of contract claim.

## II.  DETRIMENTAL RELIANCE

Boh's second cause of action, for detrimental reliance, is its better claim. Better, because the breach of contract claim was premised on a fundamentally flawed

---

[52] (Rec. Doc. 43 at 22).

[53] Brown testified, "Yeah. They [Noranda] would have to approve the invoice; send it to me and request an acceptance certificate; they would request me to pay their invoice; I would fill out his form; and send it back to them." (Rec. Doc. 43-6 at 13). This testimony is consistent with her instruction in her e-mail that Boh Bros. "should forward the invoices directly to Noranda for review." (Rec. Doc. 43-12 at 1).

[54] "[Boh Bros.], as the party who is demanding performance of an obligation, must prove the existence of the obligation." *Suire v. Lafayette City-Par. Consol. Gov't*, 907 So. 2d 37, 58 (La. 2005) (citing La. Civ. Code art. 1831).

theory that CalFirst had managed to withhold assets from the bankruptcy estate by claiming ownership of the Project but had then refused to pay the contractors that had built the project CalFirst had claimed to own. In the words of Boh Bros., this would make CalFirst guilty of "having its cake and eating it too." In actuality, CalFirst did not benefit from lessor status in the bankruptcy; CalFirst claimed a security interest. But there is certainly evidence that CalFirst *attempted* to set itself up as a lessor through the language in the Lease Agreement and by its instructions to Boh Bros. to mark invoices as being "sold to" CalFirst. This sets up a plausible claim that Boh Bros. relied to its detriment on CalFirst's representations that it was the owner of the project and Noranda was its lessee.[55] Detrimental reliance is codified in Louisiana Civil Code article 1967:

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

To prevent injustice, detrimental reliance bars a party "from taking a position contrary to his prior acts, admission, representations, or silence." *Suire v. Lafayette City-Par. Consol. Gov.*, 907 So. 2d 37, 59 (La. 2005) (citation omitted). "To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Id.* A detrimental reliance claim does not require a valid, and enforceable contract as it "is not based

---

[55] (*See* Rec. Doc. 28).

upon the intent to be bound." *Id.* "However, it is difficult to recover under the theory of detrimental reliance, because estoppel is not favored in Louisiana law." *Doss v. Cuevas*, 985 So. 2d 740, 743 (La. App. 1 Cir. 2008).

In this Court's previous order denying CalFirst's motion to dismiss Boh's detrimental reliance claim, the Court found Boh's plausible allegation to be that it had relied on CalFirst's representation that it would be paying the invoices, and to its detriment, "performed additional work on the Noranda project."[56] The Court noted, "While CalFirst argues that Boh Bros.' contract with Noranda obligated Boh Bros. to perform regardless of whether CalFirst paid, the agreement between Boh Bros. and Noranda was not presented to the Court . . . ." Now, on summary judgment, with the record fully developed, the Court concludes that the trier of fact could not reasonably find that Boh Bros. detrimentally changed its position in reliance on any representation that CalFirst would be paying Noranda's approved invoices.

Boh Bros. asserts it "would have absolutely terminated its arrangements with Noranda and CalFirst if Boh had been informed that Noranda was in breach of the Lease Agreement with CalFirst and/or that no further payment was forthcoming."[57] This muddles Boh's already dismissed negligent misrepresentation claim that CalFirst breached a duty to apprise Boh Bros. of Noranda's financial difficulties with Boh's viable detrimental reliance claim. As the Court found in its previous order, CalFirst had no duty as a matter of law to inform Boh Bros. that Noranda's potential

---

[56] (Rec. Doc. 28 at 10-11).
[57] (Rec. Doc. 43 at 30).

insolvency threatened payments to vendors.[58] The only possible representation on which Boh Bros. could have detrimentally relied, is that CalFirst would be paying the invoices in Noranda's place, with Noranda's approval.[59]

With that clarification, the Court finds it necessary to address the third element only. There is simply no evidence in the record suggesting that Boh Bros. would not have continued to work on the Project, whether it believed that Noranda would be the one paying the invoices, or CalFirst with Noranda's approval. The most obvious reason for this is that Boh Bros. was contractually obligated to perform under the Construction Contract.[60] Boh Bros. cites one case, *Shaw Constructors v. ICF Kaiser Engineers, Inc.*, 395 F.3d 533, 536 (5th Cir. 2004), in support of its argument that it could have walked away if Boh Bros. knew that the invoices would not be paid. In *Shaw*, the defendant prime contractor was in material breach because it failed to make timely payments to the subcontractor. *Id.* at 537.

In this case, Boh Bros. and Noranda agreed that Noranda would have 60 days to pay Boh's invoices.[61] The earliest issued invoice that went unpaid, Pay App. No. 3, was dated 11/6/15. Accordingly, it appears that Noranda was not required to make its next payment under the Construction Contract until January 5, 2016. Boh's work under the Construction Contract was completed as of November 24, 2015.[62] Nothing

---

[58] (Rec. Doc. 28 at 8).
[59] These are, of course, the terms of the alleged "Supply Contract" that the Court found the parties lacked intent to enter into. Again though, "the focus of analysis of a detrimental reliance claim is not whether the parties intended to perform, but, instead, whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment." *Suire*, 907 So. 2d at 59.
[60] (*See* Rec. Doc. 36-2).
[61] (Rec. Doc. 36-2 at 2).
[62] (Rec. Doc. 43 at 5).

in the record indicates this is a case like *Shaw*, where Boh Bros. would have had the right to walk away from the contract before Boh finished its work. Thus, the Court cannot agree that Boh. "detrimentally changed its position" because of CalFirst's representation. Rather, Boh simply fulfilled its obligations under an existing contract, a contract that Noranda was never shown to be in breach of while Boh was performing its work.

Moreover, the Court emphasizes that the alleged representation upon which Boh relied was that CalFirst would pay Noranda's invoices *with Noranda's approval*. As the Court found above, there is no evidence that CalFirst ever acted contrary to this representation. Summary judgment is warranted under the circumstances.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that *Motion for Summary Judgment* **(Rec. Doc. 36)** is **GRANTED**.

**IT IS FURTHER ORDERED** that within four (4) working days of the entry of this Order the parties are to submit a joint status report detailing whether there are any remaining claims in this matter.

New Orleans, Louisiana, this 13th day of February, 2019.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE